418 July 11, 2019 No. 20

IN THE OREGON TAX COURT
REGULAR DIVISION

UNITED STREETCAR, LLC,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
State of Oregon,
*Defendant*,

*and*

CLACKAMAS COUNTY ASSESSOR,
*Defendant-Intervenor.*

(TC 5318)

At issue in the motions for summary judgment of Plaintiff, United Streetcar, LLC (taxpayer) and the Defendant-Intervenor, Clackamas County Assessor (the county) were the tax years to which an enterprise zone exemption applied and whether taxpayer met its minimum employment requirements. The court determined the start and end dates of the enterprise zone exemption period, based on interpretation of taxpayer's contract with the zone sponsor and the timeline of actions of taxpayer and the sponsor, including taxpayer's application for and claiming of a construction-in-progress exemption. Further, the court concluded that a material issue of fact remained as to whether taxpayer maintained the required number of employees performing eligible activities within the enterprise zone during the relevant period. The court held that a firm applying for an enterprise zone exemption is not restricted to those eligible activities specifically marked on its exemption application. The court denied both motions for summary judgment.

Oral argument on Cross-Motions for Summary Judgment was held October 17, 2018, in the courtroom of the Oregon Tax Court, Salem.

Michael J. Mangan, Tonkon Torp, LLP, Portland, filed the motion and argued the cause for Plaintiff (taxpayer).

Marilyn J. Harbur, Senior Assistant Attorney General, Department of Justice, Salem, filed a response for Defendant Department of Revenue.

Kathleen J. Rastetter, Assistant Clackamas County Counsel, Oregon City, filed the motion and argued the cause for Defendant-Intervenor Clackamas County Assessor (the county).

Decision rendered July 11, 2019.

## ROBERT T. MANICKE, Judge.

### I.   INTRODUCTION

Defendant-Intervenor Clackamas County Assessor (the county) notified Plaintiff United Streetcar, LLC (taxpayer) on July 12, 2016, that taxpayer's property in the Milwaukie/North Clackamas enterprise zone was disqualified from enterprise zone exemption for property tax year 2016-17, and that additional tax attributable to taxpayer's entire five-year extended enterprise zone exemption period would be assessed. This case is before the court on appeal from a Magistrate Division decision upholding disqualification. Taxpayer moves for summary judgment, arguing that the term of its enterprise zone exemption ended with the prior year, such that there was no exemption in place for tax year 2016-17, and therefore no basis for the county to disqualify the property. The county opposes taxpayer's motion, asserting that the enterprise zone exemption term included tax year 2016-17 as the last year of the five-year period. The county also moves for summary judgment on the merits of the disqualification, arguing that documentary evidence makes it clear that taxpayer failed to meet the applicable employment requirements for exemption for tax year 2016-17. Defendant Department of Revenue (the department) joins in the county's filings.

### II.   ISSUES

Was the final year of taxpayer's five-year enterprise zone exemption period tax year 2015-16 or 2016-17?

If the final year was 2016-17, did taxpayer meet its minimum employment requirements for that year?

### III.   STATUTORY BACKGROUND

The Oregon Enterprise Zone Act provides temporary exemption from property taxation for "qualified" business firms that invest in "qualified" property and increase their employment within any of numerous enterprise zones located throughout the state.[1] Under the

---

[1] ORS 285C.050 to 285C.250. Unless otherwise indicated, all references to the Oregon Revised Statutes (ORS) are to the 2015 edition. The Oregon Enterprise Zone Act has been amended and recodified several times since it

"standard"[2] enterprise zone program, a firm seeking to become qualified must (1) be "eligible" based on its proposed activities or operations; and (2) become "authoriz[ed]." *See* ORS 285C.140(1)(a) (eligibility a prerequisite to authorization), ORS 285C.200 (authorization a prerequisite to qualification). To be "eligible," the firm generally must, within the zone, provide goods, products or services to businesses or other organizations through "activities including, but not limited to, manufacturing, assembling, fabrication, processing, shipping or storage." ORS 285C.135(1); *see also* ORS 285C.050(13)(a) (defining "new employees hired by the firm" to include "only those employees * * * engaged for a majority of their time in eligible operations"), ORS 285C.200(1)(a) (qualified firm must be "engaged in eligible business operations under ORS 285C.135"). An eligible firm must apply for authorization with the zone sponsor before commencing construction or hiring employees. *See* ORS 285C.140(1). The application must describe the proposed operations within the zone and include an estimate of the number of new employees and the estimated value of the proposed qualified property, among other data, as well as commitments to meet all requirements imposed pursuant to any agreement with the sponsor. *See id.* As relevant to this order, "qualified property" generally must (1) be newly constructed or installed; (2) meet a minimum cost requirement; (3) be constructed or installed for approved income-producing purposes of the firm; (4) be owned or leased by an authorized firm; and (5) be of the same "general type," and in the same location inside the geographic boundaries of the enterprise zone, as described in the firm's application for authorization. *See* ORS 285C.180.

---

was first enacted in 1985, but as relevant to this order has been unchanged for the property tax years 2010-11 through 2016-17. *See* Or Laws 2010, ch 39 (allowing waiver of certain requirements and extensions of certain deadlines during periods of economic downturn as measured by statewide nonfarm payroll employment).

[2] The Enterprise Zone Act includes several variations with different statutory requirements; this order discusses only the standard three-year exemption with optional extension of up to two years. *Cf., e.g.,* ORS 285C.400 to 285C.420 (long-term rural enterprise zone program); ORS 285C.300 to 285C.320 (reservation enterprise zones); ORS 285C.540 to 285C.559 (renewable energy resource equipment manufacturing).

The basic exemption period for the standard enterprise zone program is three years (ORS 285C.175(2)(a)); however, before authorization, a firm desiring a longer period of exemption may enter into a written agreement with the zone sponsor to extend the exemption period for up to two additional years, resulting in a total exemption period of no more than five consecutive years. ORS 285C.160(3). The sponsor may set additional reasonable requirements (such as requirements to hire and maintain more employees than the statutory minimum) as a condition of the extended exemption period. *Id*. For the first year of the exemption period, the statutory minimum generally is a 10 percent increase (compared to the firm's average employment in the zone over the 12 months before the firm applied for authorization) no later than April 1 following the year the investment is made; or, for a firm without any previous employees in the zone, one new employee. *See* ORS 285C.200(1)(c), (8)(a). Thereafter, the firm must not "substantially curtail operations" within the zone, based on a multiprong test set forth in ORS 285C.210. To be counted toward the minimum, an employee generally must work 32 hours per week in a nontemporary and non-construction job and spend a majority of his or her time in eligible operations within the zone. ORS 285C.050(7); ORS 285C.200(8)(b).

A firm anticipating enterprise zone exemption may apply for a construction-in-process (CIP) exemption for its owned or leased property under ORS 285C.170.[3] The CIP exemption, which the assessor can approve annually up to a maximum of two years, applies if the firm has been authorized and the property is expected to satisfy all requirements for enterprise zone exemption after construction or installation is complete and after the property has been "placed in service." *Id*. at (1)(h). Property is "in service" when it is "being used *** for commercial purposes consistent with the intended operations of the business firm as described in the application for authorization." ORS 285C.050(11). The assessor determines whether to approve the CIP exemption. ORS 285C.170(3).

---

[3] The terms of the CIP exemption available pursuant to ORS 285C.170 are generally similar to the widely applicable cancelation of assessment for construction in process pursuant to ORS 307.330.

From January 1 through April 1 immediately after the "assessment year"[4] in which the property is placed in service, the firm may file its first claim for enterprise zone exemption with the assessor. ORS 285C.220(1)(a). Among other data, the claim must include the number of employees within the zone on April 1 (or on the date the claim is filed, whichever is earlier); as well as the annual average number of employees in the zone during the preceding assessment year; and the annual average number of employees in the zone during the 12 months preceding the application for authorization. ORS 285C.220(1)(c). The assessor reviews the claim for compliance with minimum employment and other requirements and decides whether to grant the exemption. ORS 285C.220(4). Like other property tax exemption statutes,[5] the Enterprise Zone Act refers to the exemption period sometimes as a period of assessment years and sometimes as a period of tax years. For example, ORS 285C.175 provides that, when the assessor approves a claim, the enterprise zone exemption period begins with the first *tax* year after the assessment year in which the qualified property is in service[6] and continues for the prescribed number of

---

[4] "Assessment year" means the calendar year starting on January 1 and ending on December 31, and "tax year" means a period of 12 months beginning on July 1 and ending on June 30. *See* ORS 285C.050(20) and (22) (incorporating ORS 308.007(1)(b), (c)). For example, assessment year 2011 begins on January 1, 2011, and ends on December 31, 2011, while the corresponding tax year begins on July 1, 2011, and ends on June 30, 2012.

[5] *Compare, e.g.*, ORS 307.166(3)(a)(A) (governing application process for property leased from one organization to another; referring to "exemption[] claimed for the assessment year"), ORS 307.260(1)(a) (veteran housing exemption; referring to "assessment year for which the exemption is claimed"), ORS 307.330 (general CIP exemption; declaring property "exempt from taxation for each assessment year"), *with* ORS 307.112(4) (lease to public body; claim must be filed on or before April 1 preceding "tax year for which the exemption is claimed," "exemption first applies for the tax year beginning July 1"), ORS 307.162(1)(a) (governing application process for property leased from nonexempt owner; requiring application on or before April 1 "preceding the tax year for which the exemption is claimed").

[6] The court notes that the 2015 Legislative Assembly amended the statute governing the commencement of the exemption period to clarify that the qualified property must be in use or occupancy before July 1 of the year immediately following the year during which the property "*was first placed in service*." Or Laws 2015, ch 648, § 21 (amending ORS 285C.175(4)(d)) (emphasis added). The quoted language replaced a requirement that construction of the property be completed and thus harmonized the statute with the general requirement that the property be placed in service on or before the January 1 preceding the first tax year of exemption.

successive tax years. ORS 285C.175(2)(a).[7] On the other hand, the period for compliance with the minimum employment requirements generally is measured by *assessment* years, as in the definition of "substantial curtailment," which requires the assessor to determine whether the "annual average number of employees within the enterprise zone during the first *assessment year* for which the exemption under ORS 285C.175 is granted, or any subsequent year in which an exemption is claimed," is reduced below the greater of one of two measurements. ORS 285C.210(1)(c) (emphasis added). After filing the first claim, the firm must file a claim on or before April 1 for each subsequent year for which it seeks enterprise zone exemption. ORS 285C.220(1)(a). The exemption applies to 100 percent of the assessed value of the qualified property in each of the tax years for which the exemption is available. ORS 285C.175(3)(a).

Among other possible triggering events, a firm's property may be disqualified from enterprise zone exemption if at any time during the exemption period the firm substantially curtails its business operations, or if the firm fails to meet additional terms imposed by any extension agreement. ORS 285C.240(1)(a)-(f). If the disqualifying event occurs at any time during the exemption period, the assessor "shall disqualify the property for the assessment year following the disqualifying event and 100 percent of the additional taxes calculated under ORS 285C.175 shall be assessed against the property for *each* year for which the property had been granted exemption under ORS 285C.175." ORS 285C.240(3)(a) (emphasis added); *see also* ORS 285C.175(7) (requiring the assessor to enter on the roll the assessed value and the "amount of additional taxes that would be due if the property were not exempt"). That means even if the disqualifying event occurs in the last year of a five-year exemption period, the statute mandates that the assessor assess the previous four years' worth of tax on the property in addition to the amount of tax assessed for the fifth year. ORS 285C.240(3)(a). *See Keeter Manufacturing, Inc. v. Dept. of Rev.*, 13 OTR 124, 125-30 (1994) (explaining that "disqualification occurs at the time of the disqualifying event,"

---

[7] Therefore, in the example above, qualified property placed in service on or before December 31, 2011, would be exempt for tax year 2012-13.

and, "upon disqualification, 100 percent of the taxes previously exempted [are] to be recaptured"); s*ee also Columbia Sun, Inc. v. Dept. of Rev.*, 321 Or 514, 516, 900 P2d 1039 (1995) (discussing assessor's assessment of an additional four years' worth of taxes in addition to the amount of property tax assessed for the year of disqualification).

## IV.   FACTS

The following facts are not in dispute. For tax years 2010-11, 2011-12, 2012-13, 2013-14, 2015-16, and 2016-17, taxpayer leased land and an existing building within the Milwaukie/North Clackamas enterprise zone, which is jointly sponsored by Clackamas County and the City of Milwaukie. In August 2010, taxpayer applied for authorization, stating that it planned to construct improvements costing approximately $4 million.[8] Taxpayer's application stated that it intended to "maintain at least [five employees] as an annual average employment during the exemption period." Before its authorization, taxpayer and the zone manager, on behalf of the sponsors, signed an agreement (the Extension Agreement) extending the statutory three-year exemption period by an additional two tax years. The Extension Agreement provided, in relevant part:

> "The Zone Sponsor *extends* The Firm's property tax exemption an additional two years on all property that *initially qualifies* in the Milwaukie/North Clackamas Enterprise Zone in or before *the assessment year beginning on January 1, 2011* and, thus, sets a total period of exemption of five consecutive years during which statutory requirements for the standard three-year enterprise zone exemption must also be satisfied and maintained.

> "United Streetcar, LLC will hire and maintain at least 5 full time positions by December 31, 2011 as submitted in the Oregon Enterprise Zone Authorization Application and any other positions added that result from their investment at the compensation levels described below[.]

> "* * * * *

_____

[8] Both parties rely on the same documents submitted in separate declarations. As a matter of convenience unrelated to the merits of either party's declaration, the court will cite to the Declaration of Rastetter when citing a document contained in both parties' declarations.

"3.   Only employees working at jobs filled for the first time after the application for precertification but prior to July 1 following the first full year of the exemption and performed within the current boundaries of the Milwaukie/North Clackamas Enterprise Zone are counted; and

"4.   Only full-time, year-around and non-temporary employees engaged a majority of their time in The Firm's eligible operations under ORS 285B.707[9] are counted, regardless if such employees are leased, contracted for or otherwise obtained through an external agency or are employed directly by The Firm."

(Emphasis added.) On March 22, 2011, taxpayer applied for CIP exemption to build a "[s]treetcar test track and maintenance/testing building," in the enterprise zone. Taxpayer's application listed the "[s]tarting date of construction" as "05/01/2010" and the "[e]stimated completion date of construction" as "Mar. 31, 2011." The county approved taxpayer's CIP exemption on April 14, 2011, by countersigning taxpayer's application.

On March 30, 2012, taxpayer filed an "Oregon Enterprise Zone Exemption Claim" on Department of Revenue Form No. 150-310-075. Taxpayer attached Department of Revenue Form No. 150-310-076, entitled "OREGON ENTERPRISE ZONE PROPERTY SCHEDULE For Qualified Property of a Qualified Business Firm Placed in Service at a Location in the Enterprise Zone" (uppercase in original), on which taxpayer listed a "Streetcar Test Track & Maintenance Bldg (OIW)" at a cost of $4,098,344, improvements to existing structures at a cost of $377,809, and real property machinery and equipment at a cost of $1,100,923. For each item of property, taxpayer indicated a "date placed in service" as on or before December 31, 2011. On Line 5b of the claim form, taxpayer responded affirmatively to the question: "[I]s this the first property schedule filed with an exemption claim subject to this authorization?" On June 25, 2012, the county sent a letter to taxpayer approving its application for enterprise zone exemption. The letter stated:

---

[9] *Former* ORS 285B.707 contained the criteria for eligibility. The legislature recodified the provision as ORS 285C.135 in 2003. *See also* Or Laws 2015, ch 648, § 20 (amending ORS 285C.135(5)(d) to include certain types of business firms within zones designated for electronic commerce).

"The application filed on April 2, 2012 claiming the Enterprise Zone exemption for the ensuing 2012-13 tax year has been approved. This is the *first year* of exemption under this program."

(Emphasis added.) Taxpayer filed additional claims for enterprise zone exemption in March of 2013, 2014, 2015, and 2016. The county approved the exemption for tax years 2013-14, 2014-15, and 2015-16. The county denied the claim for tax year 2016-17. In addition, on July 12, 2016, the county sent a letter notifying taxpayer that its property was disqualified from enterprise zone exemption effective with the 2016-17 tax year because taxpayer had not met the minimum employment requirements as of April 1, 2016. As a result, the county assessed tax equal to 100 percent of the tax for the five-year exemption period, totaling approximately $322,000.

## V.   ANALYSIS

### A.   *Summary Judgment Standard*

The court grants a motion for summary judgment only if "the pleadings * * * declarations, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law." Tax Court Rule (TCR) 47 C. *See Christensen v. Dept. of Rev.*, 23 OTR 155, 162-63 (2018) (citing *Two Two v. Fujitech America, Inc.*, 355 Or 319, 331, 325 P3d 707 (2014)). "No genuine issue as to a material fact exists if, based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable [fact-finder] could [find] for the adverse party on the matter that is the subject of the motion for summary judgment." TCR 47 C. The adverse party has the burden of producing evidence on any issue raised in the motions as to which the adverse party would have the burden of persuasion at trial. *Id. See, e.g.*, *Hagler v. Coastal Farm Holdings, Inc.*, 354 Or 132, 142, 144-45, 309 P3d 1073 (2013) (nonmoving party—an injured customer—had the burden on summary judgment to produce evidence sufficient to create a genuine issue of material fact that the moving party—a business owner—"knew or should have known" that the manner in which it shelved

certain merchandise posed a danger to customers) (citation omitted).

## B.  *Parties' Arguments*

### 1.  *Taxpayer's motion*

Taxpayer moves for summary judgment on the ground that the five-year enterprise zone exemption period for its property commenced with tax year 2011-12 and ended with tax year 2015-16; therefore, as a matter of law, taxpayer was not required to meet minimum employment requirements specified in the Enterprise Zone Act or in the Extension Agreement for tax year 2016-17. Taxpayer asserts that it claimed exemption for tax year 2016-17 only by its own mistake, and that the county improperly disqualified the property based on a misinterpretation of the enterprise zone statutes and the Extension Agreement.

Taxpayer argues that by "extend[ing] the Firm's property tax exemption" on or for property that "initially qualifies" in or before the assessment year 2011, the Extension Agreement "sets forth the *period* for which the qualified property may continue to receive the exemption *as starting with* 'the assessment year beginning on January 1, 2011.'" (Emphasis added.)

The county counters that taxpayer's property could not have been entitled to enterprise zone exemption for tax year 2011-12 because the record shows taxpayer was approved for CIP exemption for that year. According to the county, that CIP exemption, and the fact that taxpayer never filed a claim for enterprise zone exemption for 2011, preclude enterprise zone exemption for taxpayer's property for tax year 2011-12, irrespective of the terms of the Extension Agreement.[10]

In interpreting the Extension Agreement, the court applies standard principles of contract interpretation. *See*

---

[10] As will be discussed when the court turns to the county's motion, the county argues that, but for taxpayer's disqualification, taxpayer's property would have been entitled to five consecutive years of enterprise zone exemption in tax years 2012-13, 2013-14, 2014-15, 2015-16, and 2016-17.

*Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997) (examining text of disputed provision in context of document as a whole; extrinsic evidence of parties' intent if provision is ambiguous; and appropriate maxims of construction if first two steps have not resolved the ambiguity). However, the "context" of any term or provision of the Extension Agreement necessarily includes the Enterprise Zone Act. The act prescribes the parties' authority to contract with each other for property tax exemption, as Article IX, section 1, of the Oregon Constitution requires a county or other local property taxing jurisdiction to levy property taxes (including the conferring of any exemptions) "under general laws operating uniformly throughout the State." Or Const, Art IX, § 1; *see also* Or Const, Art I, § 32; *Corporation of Sisters of Mercy v. Lane Co.*, 123 Or 144, 152, 261 P 694 (1927) ("There is never an exemption from taxation unless it is provided for by law."). Accordingly, any interpretation of the Extension Agreement that conflicts with the Enterprise Zone Act or other statutes is suspect.

The court concludes that taxpayer misreads the Extension Agreement and ignores the significance of taxpayer's CIP exemption for the 2011-12 tax year. The premise of taxpayer's argument is that the language of the Extension Agreement quoted above declares the starting year of the enterprise zone exemption period. Yet the Extension Agreement nowhere expressly states the starting year. The court concludes that the language quoted above simply prescribes a deadline of December 31, 2011,[11] for taxpayer's property to become "qualified."[12] As summarized above, property generally is "qualified" if it is new, meets minimum cost requirements, was constructed to further the production of income, is owned or leased by an authorized firm, is

---

[11] Because an "assessment year" means the calendar year (ORS 308.007 (1)(b)), the phrase "in or before the assessment year beginning on January 1, 2011" means anytime through December 31, 2011.

[12] Taxpayer may be reading the term "extends" in the passage quoted above to mean that the sponsor "confers" or "grants" exemption on property that qualifies on or before December 31, 2011. Consistent with ORS 285C.160(1)(a), however, the court reads the term to refer to the parties' authority to lengthen the duration of the exemption period beyond the default period of three years. *See Webster's Third Int'l Dictionary* 804 (unabridged ed 2002) (defining "extend" to mean "to cause to be longer").

located within the zone and is the same "general type" of property described in the firm's application for authorization. *See* ORS 285C.180(1). The enterprise zone exemption period, however, does not start until the tax year that starts after an additional condition is satisfied: the qualified property must have been *placed in service*. ORS 285C.175 prescribes when the exemption period begins:

> "(1)   Property of an authorized business firm is exempt from ad valorem property taxation if:
>
> "(a)   The *property* is *qualified property* under ORS 285C.180;
>
> "* * * * *
>
> "(A)   The exemption allowed under this section applies to the first tax year for which, as of January 1 preceding the tax year, the qualified property is *in service*. * * *"

ORS 285C.175(1)-(2)(a)(A) (emphases added).[13] Regardless of taxpayer's intentions when it applied for authorization,[14] the record is clear that taxpayer ultimately placed its property in service during 2011, not 2010. (Taxpayer's March 30, 2012, enterprise zone exemption claim listing the subject property as placed in service on December 15, 2011.)

The record also shows that taxpayer applied for, and was granted, CIP exemption for tax year 2011-12. Although the CIP exemption and the enterprise zone exemption are part of the same statutory scheme, each is separately available depending on different criteria, and their respective terms cumulate to a maximum of seven possible years of

---

[13] Taxpayer also misreads ORS 285C.160(2), which states (emphasis added): "The *period* for which the qualified property is to continue to be exempt must be set forth in the [extension] agreement and may not exceed two additional tax years." Taxpayer seems to assume that the word "period" refers to a specific year; from that premise, taxpayer argues that the reference in the Extension Agreement to 2011 marks that year as the commencement of the enterprise zone exemption period. However, correctly read, "period" refers not to one specific year or another (2011 vs. 2012), but to the duration of the extension (one year vs. two).

[14] Taxpayer cites its application for enterprise zone authorization as evidence that it "expected to apply for property tax exemption in *2011*, 2012, 2013, 2014, and 2015." (Emphasis added.) Indeed, the application for authorization, as amended, does state: "The anticipated first year(s) for the exemption period(s) is (are): 2011." The application indicates further that, when taxpayer signed it on August 17, 2010, taxpayer expected to finish construction of two new buildings and a new addition by October 2010.

exemption overall. *See* ORS 285C.170(4) (CIP exemption "does not depend on the property or the authorized business firm receiving the [enterprise zone] exemption under ORS 285C.175."); ORS 285C.175(5) ("Property is not required to have been exempt under ORS 285C.170 [CIP exemption] in order to be exempt under this section [enterprise zone exemption]."); ORS 285C.170(1)(h) (requiring, as a condition of CIP exemption, that there be "no known reason" to conclude that the property "will not" satisfy the requirements of the enterprise zone exemption upon being placed in service). The fact that the subject property was exempt pursuant to a CIP exemption for tax year 2011-12 proves that it was *not* entitled to, and could not have received, enterprise zone exemption for tax year 2011-12.

The court finds the following ultimate facts: (1) taxpayer became authorized for enterprise zone exemption in 2010; (2) taxpayer applied for and received CIP exemption for tax year 2011-12; (3) taxpayer placed the subject property in service during 2011; (4) taxpayer filed its first enterprise zone exemption claim in March 2012; and (5) the county approved taxpayer's claim in April 2012. On these facts only one conclusion is possible: the property could not have enjoyed enterprise zone exemption for tax year 2011-12, and the first year of enterprise zone exemption was tax year 2012-13. There is no dispute that the Extension Agreement granted taxpayer's property an additional two years of property tax abatement in addition to the standard three-year exemption. Because the statutes allow a total of five *consecutive* years of exemption, the court concludes that taxpayer's property was entitled to enterprise zone exemption in tax years 2012-13, 2013-14, 2014-15, 2015-16, and 2016-17 unless disqualified at any point during those tax years. Taxpayer's motion is denied.

2.   *County's motion*

Because the court concludes that the enterprise zone exemption period for taxpayer's property continued through tax year 2016-17, the court now must rule on the county's motion. The county asserts that taxpayer failed to meet its employment requirements under the statutes and the Extension Agreement for the period relevant to tax year

2016-17. The court views the county as making four specific points: that taxpayer (1) failed to maintain at least five full-time employees who were (2) "engaged in the approved work" and (3) performing the approved work a majority of their time (4) inside the enterprise zone. By "approved work," (which the county sometimes refers to as "authorized work" or "approved activities") the county apparently means "manufacturing, assembly or fabrication," in contrast to, for example, "act[ing] as a middle-man for parts," without fabricating or assembling the parts within the zone. ("The company must do the work approved by the Enterprise Zone sponsor * * *.") Among other evidence, the county relies on taxpayer's enterprise zone exemption claim for tax year 2016-17[15] and, in significant part, on emails between a staff member in the assessor's office and Don Hutchison, an employee of taxpayer.

Taxpayer defends on the ground that genuine issues of material fact preclude summary judgment. As the nonmoving party, taxpayer has the burden of "producing evidence" now on any issue raised in the motion as to which it would have the burden of persuasion at trial. TCR 47 C. Because taxpayer would bear the burden of proof at trial as to its entitlement to exemption from tax, taxpayer must now produce evidence countering each of the county's four allegations, to the extent those allegations are based on valid requirements under the law. *See, e.g.*, *Hagler*, 354 Or at 144-45.

Much of taxpayer's evidentiary showing in response to the county's motion misses the mark.[16] However, taxpayer

---

[15] Taxpayer now asserts that it filed this claim by mistake. For purposes of its motion, the county cites the claim because taxpayer's response to question 7 on the claim form states that taxpayer had "0" employees within the zone as of March 29, 2016.

[16] Taxpayer referred at times to facts stated in the magistrate's decision but not contained in evidence introduced in this division by stipulation, declaration or otherwise. It should be obvious to counsel that facts recited in a magistrate's decision are not automatically evidence in this division because of the requirement that the judge hear an appeal from the Magistrate Division *de novo*. *See* ORS 305.425(1); ORS 305.501(6). It is also fundamental that, because a magistrate is not bound by the evidentiary requirements that apply in this division, no part of a magistrate's findings constitutes a "record" on which this division can rely. *See* ORS 305.501(4)(a) (magistrate not bound by evidentiary rules). The court also notes that taxpayer has placed into the record in this division a list of

has introduced a declaration of taxpayer's human resources manager, Rochelle Burbank, identifying taxpayer as a wholly owned subsidiary of "Vigor Iron Works LLC and its predecessor Oregon Iron Works," and otherwise stating in relevant part:

> "3.   As of March 29, 2016, the date of USC's fifth and final *Oregon Enterprise Zone Exemption Claim*, at least seven full-time (i.e., more than 32 hours/week) employees worked at the facility at and adjacent to 9200 SW Mather Road, Clackamas, Oregon (the 'Facility') on USC projects. Prior to 2016, they were paid by USC through ADP® payroll service, but after a computer conversion, they were all converted to Vigor employees even though they continued to work on USC projects.

> "4.   In addition, at least 400 full-time employees worked at the Facility on Vigor projects in 2016, including on the design of specialized rail cars for use by the United States Department of Defense."

Burbank addresses points (1) and (4) of the county's arguments by stating under penalty of perjury that more than five employees were engaged full time within the zone at the date of taxpayer's claim, as of March 29, 2016.[17] The court finds that taxpayer has carried its burden of "producing evidence" on those two points, and that the Burbank declaration contradicts the county's factual position, creating a genuine issue of material fact as to those points.

There remain points (2) and (3)—respectively, the county's assertions that the employees were not engaged in

---

documents that taxpayer claims to have produced to the Department of Revenue in discovery. Taxpayer then appears to rely on the *list itself* as evidence supporting exemption. The court sees no probative value in such a list of documents. Merely describing documents that a party *could* introduce into evidence comes nowhere close to satisfying a party's burden to "produce evidence" on an issue as to which the party would have the burden of persuasion at trial.

[17]  The Burbank declaration is not entirely clear regarding whether taxpayer or either of its parent entities during the tax years at issue (Vigor Works LLC or its predecessor Oregon Iron Works) was the contractual or common-law employer of the employees. The declaration does, however, specify that taxpayer was a "wholly owned" subsidiary of Vigor Works LLC (and previously, of Oregon Iron Works). The county does not cite the possible involvement of either parent company as a ground for disqualification, possibly because the Enterprise Zone Act allows two firms to elect to be treated as one if one owns 100 percent of the equity interest of the other. *See* ORS 285C.135(4).

the "approved" or "authorized" "work" or "activities," and that that work or those activities did not amount to a majority of the workers' time. As to the precise nature of the activities, the county asserts that only three activities are permissible: "manufacturing, fabrication or assembly for [taxpayer]." Although the county does not fully explain this restrictive interpretation—and taxpayer inexplicably does not attempt to refute it—the court infers that the county takes the position that taxpayer's exemption required it to perform only those three activities that taxpayer selected from a list of 12 checkboxes on the Department of Revenue form on which taxpayer applied for authorization. Other activities on the application form included "Shipping," "Storage," and "Other," none of which taxpayer marked.[18] The briefing does not allow the court to determine whether the county's position is that *every* firm seeking even the minimum three-year exemption is restricted to only those activities as to which the firm checks a box on the authorization application form, or whether only those firms that enter into an extension agreement that incorporates the authorization application by reference are bound by the boxes they check. The court finds neither position convincing in this case.

The statutory origin of the form's list of activities is the requirement in ORS 285C.135 that an eligible firm "provid[e] goods, products or services to businesses or other organizations through activities including, but not limited to, manufacturing, assembly, fabrication, processing, shipping or storage." ORS 285C.135(1).[19] The court is not aware of any statutory authority that would limit every applicant for authorization to only those eligible activities that the applicant specifically identifies on the application form. Applying the Oregon Supreme Court's methodology of statutory analysis, the court considers the text, context

---

[18] The remaining checkboxes on the form are for "Bulk Printing," "Agricultural Production," "Energy Generation," "Processing," "Software Publishing," and "Back-office Systems."

[19] The same section of the application form also includes a list of "ineligible" activities (such as retail sales, health care, professional services, or construction), as well as four "Special Cases": operating a hotel, motel or destination resort; a call center; a "headquarters" facility or an "electronic commerce investment." The entire section of the form is entitled "Business Eligibility," and the topics it covers closely track the content of ORS 285C.135.

and—where useful—relevant legislative history. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). The definitional statute broadly states that a firm seeking to be "eligible" must engage in the "business of providing goods, products or services to businesses or other organizations." ORS 285C.135(1).[20] There follows an expressly *nonexclusive* ("including, but not limited to") list of six named activities that fit this broad description. *Id.* Far from limiting a firm to specific activities on the list, the statutory text allows a firm to engage in any business-to-business transaction that is not prohibited elsewhere in statute.[21]

The question then becomes whether the legislature intended to "lock in" a firm at the moment of authorization by requiring the firm to commit to a specifically identified subset of eligible activities. The authorization statute does require an applicant to include "[a] description of the nature of the firm's current and proposed business operations inside the boundary of the enterprise zone." ORS 285C.140(2)(a). But the statutory requirements for exemption do not expressly limit the firm to this description. *See* ORS 285C.200 ("qualified" firm must be "authorized"; no requirement to adhere to specific eligible activities).[22] A firm

---

[20] By contrast, the same statute counts as "ineligible" a firm that provides goods or services to the general public, including retail sales or services, child care, housing, health care, tourism, entertainment, financial or professional services, or property management. *See* ORS 285C.135(2). This restriction on purely local business activity recognizes that an enterprise zone is, by definition, generally located in an area of low income and high unemployment unlikely to sustain a market for local goods and services. *See* ORS 285C.090. The restriction is also consistent with the legislature's express desire to use the enterprise zone program and other economic development programs to "strengthen[] traded sector industries," *i.e.*, to attract businesses that can choose where to locate their operations because they sell their goods or services into markets for which national or international competition exists. *See* ORS 285A.020(1)(i); ORS 285A.010(17).

[21] In fact, the application form itself lists nearly twice as many eligible activities as those stated in the statute (not counting the catch-all "Other" category on the form). *See* Decl of Rastetter B, Ex 1 at 2. This suggests that the form's authors, Defendant and the Oregon Business Development Department, interpret the statutory list as nonexclusive. *See* ORS 285C.140(2)(g) (Defendant and Oregon Business Development Department to determine additional information for form).

[22] A statutory exception shows that the legislature knows how to require scrutiny and approval of the precise nature of the activities: a "headquarters" facility that merely supports the operation of the same firm, as opposed to other firms, can nevertheless be eligible if the facility provides administrative, design, financial, management, or marketing support to the firm's statewide, regional,

"may" amend its authorization application until the enterprise zone exemption period begins, but nothing requires it to do so. *See* ORS 285C.140(3). The disqualification statute provides a safeguard by requiring the assessor to disqualify the firm if its activities are not "eligible" activities; however, the statute does not purport to allow disqualification if the firm switches from one kind of eligible activity to another. *See* ORS 285C.240(1)(e). Thus, neither the statutory text nor the immediate context appears to confine an applicant firm to only those eligible activities that the firm marks on its application.

Taking a more expansive view of statutory context, the court finds it significant that the step of applying for authorization occurs relatively early, before a firm has started construction or hired any employees. ORS 285C.140(1)(a). The authorization statute expressly requires the firm to disclose only the "estimated" value of new improvements and an "estimate" of the number of new employees. ORS 285C.140(2)(b), (c). Rather than forcing a firm to commit to a rigidly fixed state of future facts, the statute requires the firm to disclose presently known facts (such as the number of employees within the zone in the previous 12 months) and a set of future projections.

Likewise, the legislative history of the bill that introduced the term "authorization" into the Enterprise Zone Act also provides clues indicating that the term should not be read to restrict a firm from pursuing different eligible activities beyond those marked on the application form. Before 2003, the predecessor to ORS 285C.140 required a firm to apply to the zone sponsor for "precertification" before commencing construction or hiring employees. *Former* ORS 285B.719(1)(a) (2001). In a bill overhauling and reorganizing the act, however, the 2003 Legislative Assembly replaced

---

national, or international operations. *See* ORS 285C.135(5)(b). But authorization of a headquarters facility requires an additional step—the zone sponsor must make a "formal finding" that the size of the proposed investment, the employment at the facility, "or the nature of the activities undertaken by the firm within the enterprise zone will significantly enhance the local economy, promote the purposes for which the zone was created and increase employment within the zone." ORS 285C.140(7). The authorization statute requires no such scrutiny if the firm's activities fit within the general description of eligible business-to-business activities in ORS 285C.135(1).

the term "precertification" with "authorization." Or Laws 2003, ch 662, § 30. The assistant director of the economic development agency now known as the Oregon Business Development Department testified that the purpose of the change was to eliminate confusion:

> "In the current law there's a term called 'precertification.' 'Precertification' has been confusing because there's no subsequent 'certification.' People do the precertification to essentially put the assessors on notice that they're pursuing an enterprise zone exemption. The term 'precertification' means it takes place before construction begins. We're changing that—or we're proposing to change that—to 'authorization' instead of 'precertification' [because] there's no subsequent 'certification.'"

Testimony, House Committee on Trade and Economic Development, HB 2299, Feb 23, 2003, Ex B at 3 (statement of Mike Burton). This testimony suggests that the bill's proponents had no intention that the change in terminology would require the zone sponsor or the assessor to "authorize" which eligible activities the firm could pursue; rather, the authorization process served a general notice function. The minutes summarizing the 12 days of testimony before four legislative committees give no indication that legislators questioned or disagreed with this view. Minutes, House Committee on Trade and Economic Development, Feb 24, 2003, 1-4, Feb 26, 2003, 3-5, Apr 7, 2003, 1-3, Apr 9, 2003, 2-3; Minutes, House Committee on Revenue, Apr 21, 2003, 4-7, Apr 28, 2003, 1-3, Apr 30, 2003, 1-3; Minutes, Senate Committee on Revenue, May 29, 2003, 1-7, June 10, 2003, 5-9, June 12, 2003, 1-3; Minutes, Conference Committee, July 15, 2003, 1-3, July 17, 2003, 1-2.[23] By providing notice, the authorization process weeds out projects that would be ineligible before either the firm or the zone sponsors invest substantial resources in them. Authorization at an early

---

[23] Documents accompanying the agency's oral testimony indicate that the agency intended the 2003 change to "confirm that [a firm's] descriptions only matter in the most general terms of the proposed location and broad property types, except for ['headquarters' facilities]. *** Estimates and descriptions with authorization can be critical information, but were never supposed to confound exemption to the business firm's disfavor." House Committee on Trade and Economic Development, HB 2299, Feb 23, 2003, Ex B at 4; *see also id.* Ex B at 9; *id.* Ex A at 2; House Trade and Economic Development Committee, HB 2299-3, Apr 7, 2003, Ex B.

stage, before commencing construction or hiring employees, also helps ensure that the enterprise zone program functions as a true "incentive" and does not merely afford exemption to a firm that has already committed to the new investment within the zone. *See* ORS 285C.055 ("[I]t is declared to be the purpose of ORS 285C.050 to 285C.250 to *stimulate* and protect economic success in such areas of the state by providing tax *incentives* for employment, business, industry and commerce * * *." (Emphasis added.)). In short, the court has not discovered any evidence of legislative intent to confine a firm to specific activities that fit the definition of "eligible" activities.

The court now considers whether the Extension Agreement narrows the types of permitted activities. The Enterprise Zone Act clearly authorizes the firm and the zone sponsor to agree to "any additional requirement the sponsor may reasonably require" as a condition of the additional one or two years of exemption. ORS 285C.160(3)(b) (allowing reasonable additional conditions in an urban zone); *see also* ORS 285C.160(3)(a)(B) (similar in nonurban zones). In this case, however, the text of the Extension Agreement places no express restrictions on taxpayer's activities beyond those imposed by the statute. Instead, section 3 of the agreement states: "Only full-time, year-around and non-temporary employees engaged a majority of their time in The Firm's eligible operations *under* [former] *ORS 285B.707* [now ORS 285C.135] are counted." (Emphasis added.) The Extension Agreement does refer at one point to taxpayer's authorization application: "United Streetcar, LLC will hire and maintain at least 5 full time positions by December 31, 2011 *as submitted in the Oregon Enterprise Zone Authorization Application* and any other positions added that result from their investment at the compensation levels described below[.]" (Emphasis added.) The county does not argue expressly that this provision incorporates by reference all responses set forth in taxpayer's application, and the court declines any implied invitation to interpret the emphasized phrase in the Extension Agreement as converting all responses on the authorization application form into hard and fast metrics by which to later test for disqualification.

The court concludes, therefore, that the Extension Agreement allowed taxpayer to count any activities or operations considered "eligible" under the Enterprise Zone Act when determining whether disqualification was required. On this summary judgment record, the court cannot determine that the county is entitled to prevail as a matter of law regarding whether taxpayer's activities were "eligible." Activities such as "serving as a middle-man for parts" and "warehousing" appear to be business-to-business activities as required in ORS 285C.135(1); they are not on the list of expressly ineligible activities in ORS 285C.135(2); and they may even constitute "shipping" or "storage" as expressly permitted by ORS 285C.135(1). Despite taxpayer's inattention to this issue, the court concludes that an objectively reasonable finder of fact could well find in favor of taxpayer on point (2) of the county's argument. *See* TCR 47 C.

As to point (3) of the county's argument, the same conclusion as to the type of activities that were permissible prevents the court from determining, based on the record to date, whether the employees spent the majority of their time engaged in eligible operations as the Enterprise Zone Act requires. *See* ORS 285C.050(13)(a) (definition of "new employees hired by the firm" includes only employees "engaged for a majority of their time in eligible operations"); ORS 285C.200(4)(b) (qualification of firm requires that employees "work a majority of their time in eligible operations" in the zone); ORS 285C.200(8)(b)(A) (same). The court interprets these provisions as establishing a per-employee test, *i.e.*, the statutes require that each employee whom the firm wishes to count toward the minimum requirement must work a majority of the employee's time in eligible operations within the zone. The Burbank declaration is ambiguous, if not silent, regarding whether the seven employees spent the majority of their time on eligible operations, stating only that seven "full-time * * * employees worked at the facility * * * on USC projects." The court thus has difficulty concluding that taxpayer has satisfied its burden of producing evidence on how the employees spent the majority of their time. However, because the parties apparently have proceeded on an incorrect understanding of the type of activities permitted, the overall record is even less informative about how

each employee spent the majority of time than about the related, but higher-level, question of which activities taxpayer pursued. As with point (2), the court cannot conclude that the county is entitled to judgment as a matter of law.

The county's motion is denied. At trial, taxpayer may seek to prove its entitlement to exemption, and the county may defend the assessment based on any applicable arguments, including any or all of the four arguments raised in its motion.

## VI.   CONCLUSION

Taxpayer's motion for summary judgment is denied because the record before the court proves that the final tax year of taxpayer's five consecutive tax years of enterprise zone exemption was tax year 2016-17. The county's motion for summary judgment is also denied because, applying a correct interpretation of the law governing the employment requirements, a genuine issue of material fact exists regarding whether taxpayer maintained five employees performing eligible activities a majority of their time within the enterprise zone during the period relevant to the tax year 2016-17. Now, therefore,

IT IS ORDERED that Plaintif's Motion for Summary Judgment is denied; and

IT IS FURTHER ORDERED that Defendant-Intervenor's Motion for Summary Judgment is denied.